Plaintiff sued upon a note executed by defendant to represent the deferred portion of the price of a Viking Case and Coils and a Brunner Condenser Unit. The purchased property, for the sake of brevity, will be hereinafter referred to as the "case". The note is for $570, payable in twenty-four monthly installments of $23.75 each, the first one maturing on November 11, 1939, none of which was paid. A vendor's lien and privilege on the sold property is asserted and its recognition prayed for. The suit is resisted upon the ground that the case did not and would not function efficiently and, therefore, was unsuited and unfit for the purposes for which purchased, to-wit: The preservation of fresh meats for reasonably long periods. In other words, that the case was so seriously defective as to render the sale thereof and the note sued on null and void. Defendant prays accordingly. In addition, he prays for judgment against the plaintiff for $225, being the trade-in value of an old refrigerator accepted by plaintiff on the price of the new one.
There were two trials of this case below and in each instance judgment was rendered for plaintiff as prayed for by him. Defendant prosecutes appeal.
The note sued on is in favor of the Passman Equipment Company. The preamble of the petition, in part, reads:
"The petition of Otto E. Passman * * * doing business as the Passman Equipment Company". Defendant objected to the introduction of the note in evidence until it was definitely proven that Otto E. Passman and the Passman Equipment Company are one and the same; that the company designation is merely a trade name. The note was admitted in evidence subject to the objection and evidently the trial judge decided that the evidence introduced on the subject was adequate to overcome the objection. We agree with this conclusion, although the testimony on the question is not as definite and specific as it doubtless could have been.
The memorandum of sale of the case, signed by defendant and plaintiff's agent, discloses the seller as being "Passman Equipment Company, Otto E. Passman, sole owner". This instrument was introduced in evidence without objection. The testimony of Mr. Pipes, plaintiff's regular counsel, leaves practically no doubt of the fact *West Page 788 
that Mr. Passman is in reality the Passman Equipment Company. Counsel, during the second trial, when Mr. Passman was on the stand as a witness, inadvertently failed to interrogate him on the subject. Had this been done, any uncertainty concerning the matter would doubtless have been cleared up.
Defendant, at the time of purchasing the case, lived twenty-two miles from the City of Shreveport and there operated a small retail meat market. He had been using an old ice box or refrigerator in which meats were kept. This box became nondependable and he entered into negotiations with plaintiff's agents, looking to the acquisition of a new and better case. A trade was closed between them on September 21, 1939. The new case was installed October 9th by plaintiff's service man, Mr. John M. Bateman. He set the mechanism so that it would maintain a temperature of from 36° to 38°, conceded by all to be adequate to preserve fresh meats.
On Saturday of each week defendant procured a supply of fresh meat from a packing house in the City of Shreveport. After purchasing the meat, generally, as to beef, in quarter quantities, he would deposit it in an open passenger car and transport it to his place of business. The quarters would then be cut into smaller pieces in order to place them in the case where they would remain until again taken out and cut to accommodate customers. It soon developed that the portion of the meat not disposed of by the following Wednesday or Thursday would sour and spoil. This, defendant contends, occurred each week of the six or eight weeks the case was in operation.
One of plaintiff's agents stopped at defendant's place of business after the meats began to spoil and defendant complained to him that the case was not giving satisfactory service and stated that he thought the temperature thereof should be lowered considerably. The agent complied with the request and set the mechanism so that a freezing temperature would be maintained. The result was that all the meats froze. Soon thereafter this agent contacted Mr. Bateman, plaintiff's chief service man, and imparted to him that defendant was complaining about the meats spoiling, and at that time he told Mr. Bateman what he had done toward lowering the case's temperature. Bateman promptly went to defendant's place and finding the meats frozen, readjusted the mechanism of the case so as to maintain a temperature of from 34° to 38°. At that time he employed the proper gauges to determine the case's functioning and remained there for three or four hours to observe it. However, meat thereafter placed in this case would sour and spoil as before. Defendant discontinued the use of the case on or about November 25, 1939, without making any further complaint to plaintiff concerning its supposed defective condition. This was done by him notwithstanding the fact that he held plaintiff's written obligation to service the case free of charge for twelve months and knew that plaintiff had competent service men in the City of Shreveport who would promptly respond to a request for service from him.
Plaintiff and his agents say that the case functioned efficiently and was free from defects, and accredit the spoiling of the meats to the manner and method in which such meats were handled by defendant after being purchased in Shreveport and until placed in the case. The lower court evidently agreed with this theory, and so do we.
Viking cases, it is not denied, rank with the best of the kind manufactured in this country. Plaintiff has sold over fifteen hundred (1,500) of them and of this large number only one has proven defective. Of course, being mechanical, as is true of all other forms of mechanical devices, it is not impossible that occasionally an imperfect case would be found; but, imperfections of this character may be corrected by competent artisans.
Packing houses, in order to keep their fresh meat products in satisfactory state of preservation, maintain a temperature a few degrees above freezing. It is harmful to beef to allow it to freeze.
Defendant testified that it required from forty minutes to one hour to transport the meat from Shreveport to his place of business. It required several minutes to cut the meat into pieces small enough that the case would accommodate them. During the time he operated the case (from October 9th to November 25th) the weather, in the main, was warm. In addition, the meat was exposed while in transit to the added heat of the automobile. During the trip from the packing house to the case, under the mentioned conditions, it would not be surprising that the tissues of the outer part of the meat would undergo a transition not conducive to its continued wholesome *West Page 789 
preservation. We are convinced that this did occur and that therein lies the cause of the meats spoiling.
Mr. W.D. Smith, expert witness for defendant, testified that meat taken from cold storage would deteriorate if exposed to warm temperature but did not think an exposure of an hour would prove injurious. He stated that the length of periods in which such meats would begin to deteriorate depends upon circumstances, such as its temperature when removed from cold storage, the outside temperature, length of time it was exposed to warm air, etc.
Plaintiff has been in the refrigerator business for many years. He evidently understands it quite well. As a witness he demonstrated extensive knowledge of meats and their preservation. His testimony is not at variance with that given by Mr. Smith, with respect to the effect high temperature will have on meats removed from cold storage, save as to the element of time necessary to work injury thereto. He testified as follows:
"A. * * * If meat is fresh and at a cold temperature and you keep that meat out as long as forty minutes, the tissues begin to break down and when bacteria is in the top tissues it will break on through. Bacteria is going to set in whenever the temperature reaches forty-five or fifty degrees. You can ascertain this as being absolutely correct. If you leave the meat out for as long as one hour, you should not attempt to sell that meat unless you sell it the same day, because those tissues have broken down, bacteria has set in, and if the top part of the meat is spoiling, it is very definitely going to contaminate the meat next to it, and the first thing you know, the whole piece of meat is going to be bad. You can lose meat in cold storage at twenty-five degrees.
"If meat is taken out of a temperature of twenty-five degrees and put in a temperature of sixty degrees, and then you attempt to pull the temperature back down again, your meat is going to be bad in three or four days. If this gentleman had handled native meat it would have been different, but it has been testified that he handled packing house meat all the way through. He attempted to haul this meat in a car where the exhaust in the car may have been building the temperature up to sixty degrees."
* * * * *
"A. If you take the chance of pulling meat out of cold temperature into heated temperature, and then pulling it back down to cold, and then expect that meat to keep three or four days, it just won't do it."
For the reason assigned by plaintiff, packing houses long ago ceased delivering their meat products to customers in open, non-refrigerated vehicles. They now employ vehicles with closed apartment in which the temperature is kept so low that there is no danger of the meat's condition deteriorating.
It seems to us that if a case of this character will maintain the temperature adequate to prevent meat from spoiling for three or four days, and also a temperature sufficiently low to freeze meats, surely temperature between these extremes may be maintained. Defendant's expert, Smith, is positive on this point. He testified that fresh meats should be satisfactorily preserved in this case for ten or twelve days. He was asked:
"Q. Mr. Smith, if a box can be so adjusted as to freeze meat, cannot that same box be so adjusted as to keep meat the length of time you have stated? A. Absolutely."
It is not without significance that after Mr. Bateman adjusted this case following the freezing of the meat, notwithstanding plaintiff says the meats continued to spoil, he made no complaint whatever to plaintiff or his agents regarding the same. As said before, he knew that he was entitled to twelve months of free service. It is also strange that when this suit was threatened and defendant's attitude toward the note became known, he refused to allow plaintiff's agents to reconnect the case and demonstrate its efficiency, although they went to his place of business and offered to do so.
The plaintiff carried the burden of proof on the issue tendered by the defense, to-wit:
That the case was not suited for the purposes for which bought and sold. This burden has been successfully discharged. A. Baldwin Sales Company, Inc., v. Mitchell, 174 La. 1098-1103,142 So. 700.
Only a factual question is involved in the determination of this case. It was resolved against the defendant and in our opinion, properly so. Certainly no manifest error appears in the trial judge's conclusions, and for the reasons herein assigned, the judgment appealed from is affirmed with costs. *West Page 790